1          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION

3

4

5   TERRA WINTHROP,

6           Plaintiff,

7   vs.                    Case No.:  8:18-cv-1452-T30-AEP

8   CHRIS NOCCO, PASCO
    COUNTY SHERIFF,
9
            Defendant.
10

11

12
        DEPOSITION OF:        COL. JEFFREY HARRINGTON
13

14      TAKEN:               Pursuant to Notice
                             Instance of Plaintiff
15

16      DATE:                April 23, 2019

17
        TIME:                Commencing at 10:02 a.m.
18

19      PLACE:               Parliamentary Reporting
                             8520 Government Drive
20                           New Port Richey, Florida

21
        BEFORE:              BONNIE L. SOULTS
22                           Stenographic Court Reporter
                             and Notary Public - State
23                           of Florida at Large

24

25

1

2                          APPEARANCES

3

4
              ERIK De L'ETOILE, Esquire
5             De L'Etoile Law Firm, P.A.
              10150 Highland Manor Drive
6             Suite 200
              Tampa, Florida  33610
7

8
                    Attorney for Plaintiff
9

10

11            MATTHEW D. STEFANY, Esquire
              Allen, Norton & Blue, P.A.
12            324 South Hyde Park Avenue
              Suite 225
13            Tampa, Florida  33606

14

15                  Attorney for Defendant

16

17
              ALSO PRESENT:  Terra Winthrop
18

19

20

21

22

23

24

25

INDEX

Page

Direct Examination by Mr. De L'Etoile          4

Stipulations                                  18

Deponent's Signature Page                     19

Certificate of Reporter Oath                  21

Reporter's Deposition Certificate             22

EXHIBITS

Page

Plaintiff's Exhibit 1                          9

1          COL. JEFFREY HARRINGTON,

2     the Deponent herein, having been first duly sworn, was

3     examined and testified as follows:

4          THE DEPONENT:  I do.

5                    DIRECT EXAMINATION

6     BY MR. De L'ETOILE:

7     Q    Good morning.  Thank you for being here.

8     A    Good morning.

9     Q    Would you mind please stating your name for the

10    Record?

11    A    Jeffrey Edward Harrington.

12    Q    Mr. Harrington, have you ever been deposed before?

13    A    I have.

14    Q    I'm going to just ask you a couple of questions.  I'm

15    not asking you to guess or assume.  If you don't

16    understand what I'm asking, please just let me know that.

17    If you need a break or something, please let me know.  I

18    don't think we're going to be here long enough that you'll

19    need a break, but if you do, just let me know.  And by all

20    means, you can take a break at anytime you want as long as

21    I'm not right in the middle of a question.

22    A    Okay.

23    Q    So just let me know.  Who is your current employer?

24    A    The Pasco County Sheriff's Office.

25    Q    How long have you been employed by them?

1    A    It will be eight years in October.  And then I had a

2    previous time with the Sheriff's Office back in the early

3    90's.  So it's close to a decade in total.

4    Q    And in between the two times that you worked for the

5    Pasco Sheriff's Office, did you work for any other law

6    enforcement agencies?

7    A    Yes.

8    Q    And who was that?

9    A    The City of New Port Richey and the City of

10   Clearwater.

11   Q    Why did you leave those departments?

12   A    I left New Port Richey originally back in the late

13   90's to go to Clearwater, and then I left Clearwater.  I

14   was separated on probation.  And then I went back to the

15   Sheriff's Office after my time at the New Port Richey

16   Police Department.

17   Q    When you say separated on probation, what do you mean?

18   A    I was a probationary employee, and I received a letter

19   from the City of Clearwater that I had failed to meet

20   probation.

21   Q    Do you know why you failed to meet probation?

22   A    I can speculate, but you'd have to ask them why.

23   Q    Okay.  That's fine.  What is your rank with the Pasco

24   Sheriff's Office?

25   A    I'm the Chief Deputy with a rank of Colonel.

1   Q   Okay. And as Chief Deputy, what would your -- what

2   would you say your job responsibilities are?

3   A   I'm responsible for the day to day operations of the

4   Sheriff's Office, so I coordinate with the Sheriff. And

5   I take his vision and implement it into plans, so that we

6   can accomplish that vision.

7   Q   So as part of those day to day operations, would you

8   say you also make employment decisions on whether to hire

9   or fire or promote any individuals?

10   A   Decisions?

11   Q   Yes, sir.

12   A   No.

13   Q   Who would make the decisions whether or not to hire or

14   terminate someone?

15   A   So hiring decisions are generally made at the Bureau

16   Commander level. Promotions are made by the Sheriff, and

17   terminations are made by the Sheriff.

18   Q   During your time with the Pasco Sheriff's Office, have

19   you ever been subject to any internal affairs

20   investigations?

21   A   Yes.

22   Q   Do you know what those were for?

23   A   I don't know the content, and I haven't seen the

24   complaint. But there's one ongoing right now.

25   Q   Have there ever been any findings against you for

1    conduct unbecoming an officer?

2    A    No.

3    Q    Do you know who made the current allegations against

4    you that you said were ongoing?

5    A    Yes.

6    Q    And do you know who that person is?  Are you able to

7    tell me their name?

8    A    One of them is Anthony Pearn.  One of them is John

9    Horning.  And I don't know specifically if the third

10   person made a complaint specifically against me.

11   Q    And I don't want you to guess.  Have you ever filed

12   any internal affairs complaints against any officers?

13   A    No.

14   Q    Do you know who Miss Terra Winthrop is?

15   A    I do.

16   Q    And how do you know her?

17   A    Over the years, we've had interactions in our

18   profession as law enforcement officers.

19   Q    What would you -- how would you classify your working

20   relationship with her?

21   A    The working relationship, I thought, was fine.

22   Q    Did you ever have any issues with her?

23   A    Personally, no.

24   Q    What about professionally?

25   A    No.

1  Q    Did you ever witness or hear about any other officers

2  having any issues with her?

3          MR. STEFANY:  I object to the form.  You can

4      answer.

5  BY THE DEPONENT:

6  A    So when you say hear, so in my position as the Chief

7  Deputy or previously as a Bureau Commander, I'd be -- I

8  would be briefed on matters that were taking place.  But

9  the specific reading of complaints or corrective actions

10  against her, I've never read any of the files against

11  Terra.

12  BY MR. De L'ETOILE:

13  Q    Were you ever briefed on any issues with Miss

14  Winthrop?

15  A    Yes, broadly.

16  Q    What issues would those have been?

17  A    So there was an incident with a supervisor, or I think

18  Terra was -- complained about somebody's conduct.  I was

19  made aware of that.  There was an issue at one of the

20  schools.  I was made -- I was briefed about that.  And

21  then there was a subsequent complaint, I believe, against

22  Terra that I became aware of.  And that, in addition to --

23  that was pretty much contemporaneous with the arrest that

24  New Port Richey made.

25  Q    Now, other than being being briefed on these issues,

1  did you take any part in any investigations?

2  A   No.

3  Q   Did you make any determinations on punishment?

4  A   No.

5  Q   From your experience at the Pasco Sheriff's Office, do

6  you feel like female officers get promoted at the same

7  rate as male officers?

8  A   I do.

9  Q   How many female officers would you estimate are in

10 supervisory capacities at the Pasco Sheriff's Office?

11         MR. STEFANY:  I object to the form.  You can

12     answer.

13 BY THE DEPONENT:

14 A   Supervisory roles?  So you're taking about a

15 significant number of personnel.  I can't calculate that

16 right here.  We have close to fifteen hundred members, and

17 we have a number of Bureau Commanders and supervisors that

18 are female.  But the number and the proportion, I don't

19 know.

20 BY MR. De L'ETOILE:

21 Q   Okay.  I'm going to show you Plaintiff's Exhibit 1.

22 (Whereupon, Plaintiff's Exhibit Number 1 was marked for

23 identification by the Court Reporter.)

24 BY MR. De L'ETOILE:

25 Q   What I'm going to reference is the e-mail that starts

1  on the bottom half of the page, and I guess is just on the

2  top half of the -- the top two lines of the second page.

3  Have you ever seen this e-mail before?

4  A   Yes.

5  Q   Do you remember about when you saw it?

6  A   Yes.

7  Q   When was that?

8  A   Yesterday.

9  Q   So before yesterday, you had never seen this e-mail

10  before?

11  A   No.

12  Q   In this e-mail -- this is an e-mail from Miss Winthrop

13  to Justin Smith, James Law and Michael Jenkins.  The three

14  of them are Pasco Sheriff's officers?

15  A   Yes.

16  Q   After reading what was in this e-mail yesterday, had

17  you been aware of any of the issues in this e-mail

18  previously?

19  A   So I didn't even read the whole thing.  So I became

20  aware of it yesterday, and I didn't even read the entire

21  e-mail in its totality.  So I don't know exactly what the

22  content is.

23  Q   Okay.  Well, I can give you a few minutes to read it.

24  It's not long.  It's just the bottom half of the page

25  there.

1    A    Okay.  I've read it.

2    Q    So prior to reading this e-mail, the issues that Terra

3    is describing in here, did you have any knowledge of this

4    personal issue that she was experiencing?

5              MR. STEFANY:  I object to the form.  You can

6         answer.

7    BY THE DEPONENT:

8    A    That part of it, no.

9    BY MR. De L'ETOILE:

10   Q    Did you personally have any conversations with anyone

11   at the New Port Richey Police Department regarding Miss

12   Winthrop?

13   A    No.

14   Q    Do you know who at the Pasco Sheriff's Office would

15   coordinate with the New Port Richey Police Department

16   regarding an arrest of an officer?

17   A    So that's -- that's hypothetical.  It would depend on

18   the circumstance.  We've had a circumstance where the

19   Chief has called me and told me about an arrest.  And so

20   I don't recall ever talking to the Chief about this

21   particular matter.  And so I remember talking to the Chief

22   about other issues.  But I don't know how we became, as an

23   organization, aware of what New Port Richey was doing.

24   Q    Do you know who within the Pasco Sheriff's Office made

25   the decision to terminate Miss Winthrop's employment?

1  A   Yes.

2  Q   Who made that decision?

3  A   The Sheriff.

4  Q   Do you know, from your knowledge, who the Sheriff

5  consulted to make that decision?

6  A   There was no consultation.

7  Q   So do you know why he made the decision to terminate

8  her?

9  A   It was based on the fact that it was an arrest, and it

10  was a domestic violence in nature.

11  Q   Does the Pasco Sheriff's Office have a policy to

12  terminate any employees who are arrested for a domestic

13  violence?

14  A   So we look at each case on a case by case, what the

15  totality of the fact pattern is.  So a policy, per se?

16  Nothing written.  But I don't know of anybody who has ever

17  been arrested for a domestic violence who was not

18  terminated.

19  Q   Do you know, does the Pasco Sheriff's Office make any

20  determinations based on whether or not somebody is

21  actually convicted?

22  A   That is a part of the decision making process.  It's

23  the fact -- the trigger event would be the arrest.

24  Q   So even if the person is completely innocent, just

25  because they were arrested, they would still be

1 terminated?

2        MR. STEFANY: I object to the form. You can

3   answer.

4 BY THE DEPONENT:

5 A   In matters of a domestic violence, nobody -- I don't

6 know of anybody that's not been arrested.

7 BY MR. De L'ETOILE:

8 Q   Meaning someone who had a complaint made against them

9 not get arrested?

10 A   So if there was probable cause to support an arrest,

11 and they were, in fact, arrested, I can't think of any

12 Deputy Sheriffs or employees that meet that criteria that

13 were not arrested.

14 Q   Other than a domestic violence, is there any other, I

15 guess, crimes that if somebody was arrested for, that they

16 would automatically be terminated?

17 A   So the termination component, that's -- that's within

18 the purview of the Sheriff. And so we've taken an

19 approach that each case is looked at on a case by case

20 circumstance -- what the charge is, and what the totality

21 of the circumstance is.

22 Q   So do you know who would prep or brief the Sheriff on

23 a particular case, since it's made on a case by case

24 basis?

25 A   I would.

1  Q   So did you brief the Sheriff in regards to Miss

2  Winthrop?

3  A   Yes.

4  Q   And based upon your brief of the events is when the

5  Sheriff made the decision to terminate her?

6  A   Correct.

7  Q   Do you know if anyone at the Pasco Sheriff's Office

8  spoke to Miss Winthrop prior to her arrest to get her side

9  of the story?

10  A   I don't know that anybody did.

11  Q   Is that something that's ever done by the Pasco

12  Sheriff's Office?  If they learn of allegations regarding

13  a possible arrest, do you ever reach out to your officer?

14  A   Prior to the execution of an arrest?

15  Q   Right.  So in this case -- I'm sorry.  That was kind

16  of a confusing question.  In this case, Miss Winthrop had

17  made her supervisors aware that a complaint had been made.

18  And so with this knowledge, I'm just wondering, normally

19  would the Sheriff's Office ever speak to their own

20  employee first?

21  A   So on this -- so on this fact pattern, I see no reason

22  to have a conversation.  There is nothing in the fact

23  pattern that would make us talk to an employee.  And so in

24  this matter, no, I wouldn't see that we talked to her.

25  Q   Who at the Sheriff's Office would put together

1  termination paperwork?

2  A    H.R.

3  Q    And that's something that the Sheriff would direct

4  them to do, or is that something that you would direct

5  them to do?

6  A    Generally, it would be me.  So I'd have a conversation

7  with the Sheriff and receive direction from him.  And then

8  we'd call H.R., and tell them to direct -- or to draft up

9  a letter.

10 Q    Do you know, is that what happened in this case?

11 A    Yes.

12 Q    Do you know if anyone from the Pasco Sheriff's Office

13 asked the New Port Richey Police Department to hold off on

14 the arrest until the termination paperwork was ready?

15 A    I don't know that.

16 Q    So in this case, you're not aware who coordinated

17 between the Pasco Sheriff's Office and the New Port Richey

18 Police Department?

19 A    No.

20 Q    Do you know who would have directed Officers Coker and

21 Barrington to bring the termination paperwork directly to

22 Miss Winthrop?

23 A    I don't know specifically.  Generally our process is,

24 we get the letter.  And I would call the Bureau Commander

25 that's involved that the member works for and direct them

1    to execute the service.  How they execute it is up to

2    them.

3         MR. De L'ETOILE:  If you guys can give us just a

4         second?  We're going to step outside real quick and

5         have a quick conversation.

6         MR. STEFANY:  Sure.

7    (Whereupon, a brief recess was held.)

8    BY MR. De L'ETOILE:

9    Q   Just a couple last questions.  You indicated that you

10   briefed the Sheriff on the incident that led to the

11   termination.  Who briefed you on the facts?

12   A   I don't specifically recall.  And the briefing was

13   more of a statement of fact, as opposed to a facts and

14   circumstances information brief.  It was a statement of

15   something along the lines of Terra Winthrop was arrested

16   by the New Port Richey Police Department.

17   Q   And you're not sure who provided that to you?

18   A   I don't specifically recall.

19   Q   Do you know what information was given to you?

20   A   That Terra had been arrested by the New Port Richey

21   Police Department for a domestic violence.

22   Q   No other information regarding surrounding that

23   arrest --

24   A   No.

25   Q   -- or who made the complaint?

1  A  The complainant may have been discussed.  I don't

2  specifically recall.

3  Q  And so the discussion with the Sheriff focused solely

4  on the fact that an arrest had been made for a domestic

5  violence, and that was essentially it?

6  A  Correct.

7  Q  Was anything else regarding Terra's employment

8  discussed with the Sheriff?

9  A  As far as?

10  Q  Any other incidents, or any other aspects of her

11  employment?

12  A  No.  No, the arrest was the trigger event.

13       MR. De L'ETOILE:  I have no further questions for

14    you today.

15       MR. STEFANY:  No questions.

16       THE DEPONENT:  Read.

17  (Whereupon, a discussion was held off the Record.)

18       MR. De L'ETOILE:  I'll order, yes.

19       MR. STEFANY:  I'll take a copy, sure.

20  (Whereupon, the deposition was concluded at 10:29 a.m.)

21

22

23

24

25

STIPULATION

It was hereby stipulated and agreed, by and between
counsel present at this deposition and the deponent,
that the reading and signing of the deposition be not
waived.

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION


TERRA WINTHROP,


     Plaintiff,

vs.               Case No.:  8:18-cv-1452-T30-AEP


CHRIS NOCCO, PASCO

COUNTY SHERIFF,


     Defendant.




DEPONENT SIGNATURE PAGE


     I HAVE READ THE FOREGOING TRANSCRIPTION OF MY

DEPOSITION, PAGE 4 THROUGH 17, AND HEREBY SUBSCRIBE TO

THE FOREGOING DEPOSITION, SAID SUBSCRIPTION TO INCLUDE

ANY CORRECTIONS AND/OR AMENDMENTS HERETO.




                  _____

                  COL. JEFFREY HARRINGTON

PAGE     LINE     CORRECTED TO READ AS FOLLOWS:

1
2  _____  _____  _____
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA

COUNTY OF PASCO

I, the undersigned authority, hereby certify that the witness named herein personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 26th day of April, 2019.

*Bonnie L. Soults*

BONNIE L. SOULTS

Notary Public - State of Florida

My Commission No.: GG 048520

Expires: 01-01-2021

NOTARY PUBLIC
BONNIE L SOULTS
MY COMMISSION # GG 048520
EXPIRES: January 1, 2021
STATE OF FLORIDA
Bonded Thru Budget Notary Services

```
 1              REPORTER'S DEPOSITION CERTIFICATE
 2    STATE OF FLORIDA
 3    COUNTY OF PASCO
 4              I, BONNIE L. SOULTS, Court Reporter, Notary
 5    Public in and for the State of Florida at large, hereby
 6    certify that the witness appeared before me for the taking
 7    of the foregoing deposition, and that I was authorized to
 8    and did stenographically and electronically report the
 9    deposition; and that the transcript is a true and complete
10    record of my stenographic notes and recordings thereof.
11              I FURTHER CERTIFY that I am neither an attorney
12    nor counsel for the parties to this cause nor a relative
13    or employee of any attorney or party connected with this
14    litigation, nor am I financially interested in the outcome
15    of this action.
16              DATED this 26th day of April, 2019, at New Port
17    Richey, Pasco County, Florida.
18
19
20
              Bonnie L. Soults
21              BONNIE L. SOULTS
22              Notary Public - State of Florida
23              My Commission No.:  GG 048520
24              Expires:  01-01-2021
25
```